No. 1:13-cv-00258-AJT-TRJ

IN THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

_____

IN RE WSG DULLES, L.P., *ET AL.*,[1]
*Debtors*,

_____

WSG CHARLOTTESVILLE, LLC,
*Appellant*,

v.

LBCMT 2007-C3 STERLING RETAIL, LLC, LBCMT 2007-C3 PLEASANT RETAIL LIMITED PARTNERSHIP, LBCMT 2007-C3 SEMINOLE TRAIL, LLC, LBCMT 2007-C3 W. BROAD STREET, LLC, LBCMT 2007 C-3 SNELLVILLE RETAIL PARTNERSHIP, LBCMT 2007 C-3 PECANLAND, LLC, AND LBCMT 2007 C-3 RHL BLVD. LIMITED PARTNERSHIP,
*Appellees*.

_____

On Appeal from the United States Bankruptcy Court
For the Eastern District of Virginia
Alexandria Division
Case No. 12 -12785-BFK

_____

**BRIEF OF APPELLANT**

_____

Lawrence A. Katz (VSB No. 47664)
Stephen E. Leach (VSB No. 20601)
Kristen E. Burgers (VSB No. 67997)
Leach Travell Britt pc
8270 Greensboro Drive, Suite 700
Tysons Corner, Virginia 22102
Email: lkatz@ltblaw.com
Telephone: (703) 584-8362
Facsimile:  (703) 584-8901

*Counsel to the Appellant*

---

[1] The Debtors in these cases include WSG Dulles, L.P. (Case No. 12-11149-BFK), WSG Dulles GL, LLC (Case No. 12-11151-BFK), WSG Trace Fork LP (Case No. 12-11756-BFK) and WSG Charlottesville, LLC (Case No. 12-12785-BFK).

## TABLE OF CONTENTS

I.      STATEMENT OF APPELLATE JURISDICTION ........................................................... 1

II.     STATEMENT OF ISSUES ON APPEAL ...................................................................... 1

III.    STATEMENT OF THE CASE........................................................................................ 1

IV.     STATEMENT OF FACTS ............................................................................................. 1

A.      Background ................................................................................................................... 2

B.      The Lehman Refinancing.............................................................................................. 3

C.      Events Leading to the Bankruptcy Filings................................................................... 5

D.      The Chapter 11 Bankruptcy Cases............................................................................... 7

E.      The Motions to Dismiss ............................................................................................... 8

F.      The Debtors' Chapter 11 Plan...................................................................................... 9

V.      STANDARD OF REVIEW .......................................................................................... 11

VI.     ARGUMENT ............................................................................................................... 11

A.      Dismissal of the Bankruptcy Cases Was Not Warranted under the *Carolin* Test. ........... 11

        1.      Failure to Pay Sums Due to Primary Lender Pre-Petition is Not *Per Se* Evidence
                of Bad Faith. ..................................................................................................... 12

        2.      The Fact that the Plan Requires Modification Does Not Necessarily Render the
                Bankruptcy Cases Objectively Futile. ................................................................ 15

B.      Relief from the Automatic Stay Was Not Appropriate Where the Debtors Have
        Equity. .......................................................................................................................... 17

VII.    CONCLUSION............................................................................................................ 19

## TABLE OF AUTHORITIES

<u>CASES</u>

*Carolin Corp. v. Miller*, 886 F.2d 693, 694 (4th Cir. 1989)........................11, 12, 13, 14, 15, 16, 17

*In re Easthaven Marina Group, LLC,* Case No. 08-05453-8-JRL, unpublished opinion dated February 25, 2009 ........................................................16

*In re Johnson*, 312 B.R. 810 (E.D. Va. 2004) ...........................................11

*JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns, Inc.)*, 419 B.R. 221 (Bankr. S.D.N.Y. 2009) ...................17

*In re Landmark Atlantic Hess Farm, LLC*, 448 B.R. 707 (Bankr. D. Md. 2011)...........12

*In re Litton*, 330 F.3d 636 (4th Cir. 2003) .................................................11

*In re McKoy*, 211 B.R. 843 (E.D. Va. 1997)...............................................11

*In re Southeast Hotel Properties, L.P.*, 99 F.3d 151 (4th Cir. 1996) ...................11

<u>STATUTES</u>

11 U.S.C. § 362(d)(2)....................................................................................18
11 U.S.C. § 1112 ...........................................................................................11
11 U.S.C. § 1112(b)(1) .................................................................................11
11 U.S.C. § 1112(b)(4) .................................................................................11
11 U.S.C. § 1112(b)(4)(A) ...........................................................................11
11 U.S.C. § 1112(b)(4)(B) ...........................................................................11
11 U.S.C. § 1112(b)(4)(J) .............................................................................11
28 U.S.C. § 158(a) ..........................................................................................1

<u>RULES</u>

Federal Rule of Bankruptcy Procedure 8001(a) ............................................1

## I.  STATEMENT OF APPELLATE JURISDICTION

This Court has jurisdiction over this appeal of a final order of the Bankruptcy Court

under 28 U.S.C. § 158(a) and Federal Rule of Bankruptcy Procedure 8001(a).

## II.  STATEMENT OF ISSUES ON APPEAL

1. Did the Bankruptcy Court err in holding that the Debtor's bankruptcy case was filed in subjective bad faith under the standard established by the Fourth Circuit in *Carolin Corp. v. Miller*, 886 F.2d 693(4th Cir. 1989)?

2. Did the Bankruptcy Court err in holding that the Debtor's bankruptcy case was objectively futile under the standard established by the Fourth Circuit in *Carolin Corp. v. Miller*, 886 F.2d 693(4th Cir. 1989)?

3. Did the Bankruptcy Court err in finding that there was no effective plan of reorganization in prospect, and thus holding that relief from the automatic stay was appropriate under section 362(d)(2) of the Bankruptcy Code?

## III.  STATEMENT OF THE CASE

This is an appeal from (i) the Memorandum Opinion (the "Opinion") and (ii) the Order

Dismissing Case with Prejudice (the "Order") [Docket No. 63 and 64, respectively], each entered

on the docket on January 4, 2013 and issued by the United States Bankruptcy Court for the

Eastern District of Virginia (the "Bankruptcy Court") in the bankruptcy proceedings of WSG

Charlottesville, LLC ("Charlottesville") under chapter 11 of title 11 of the United States

Bankruptcy Code (the "Bankruptcy Code").  Charlottesville filed a Notice of Appeal on January

18, 2013 [Docket No. 68].

## IV.  STATEMENT OF FACTS

On May 1, 2012, Charlottesville filed a voluntary petition for relief under chapter 11 of

the Bankruptcy Code initiating its chapter 11 case (the "Charlottesville Case").  The

Charlottesville Case is being jointly-administered with the chapter 11 cases of WSG Dulles, L.P.

("Dulles LP") (Case No. 12-11149-BFK, filed on February 23, 2012), WSG Dulles GL, LLC

1

("Dulles GL" and, together with Dulles LP, the "Dulles Debtors") (Case No. 12-11151-BFK, filed on February 23, 2012) and WSG Trace Fork, L.P. ("Trace Fork") (Case No. 12-11756-BFK, filed on March 16, 2012), with Dulles LP as the lead case.  Together, Dulles LP, Dulles GL, Trace Fork, and Charlottesville are hereinafter referred to as the "Debtors" and their respective chapter 11 cases as the "Bankruptcy Cases."  All references to docket numbers hereinafter refer to the docket of Dulles LP, unless otherwise stated.

Throughout the pendency of the Bankruptcy Cases, the Debtors retained custody of their respective assets and operated their respective businesses as "debtors-in-possession" pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No motion seeking appointment of a trustee or examiner was filed in the Bankruptcy Cases, and no unsecured creditors' committee was appointed by the Office of the United States Trustee.

A.     Background

The Debtors are single-purpose entities developed, constructed, and managed by WSG Development Company ("WSG Development"), a national real estate development firm specializing in the acquisition, construction, and development of commercial real estate.  WSG Development was founded in 1995 by Philip Wolman and Eric Sheppard, and Mr. Wolman and Mr. Shepherd continue to own many of WSG Development's properties, including those owned by the Debtors.[1]  Many of the commercial projects developed by WSG Development are "outparcels" – small retail strip malls located adjacent or in close proximity to larger malls.

---

[1]   In paragraph 1 of the Opinion, the Bankruptcy Court states that the Debtors are under the control of Eric Sheppard and Robert Kalman.  Similarly, in paragraph 3 of the Opinion, the Bankruptcy Court states that "Mr. Sheppard and Mr. Kalman have successfully developed numerous properties throughout the country."  These assertions are factually inaccurate.  Mr. Sheppard's primary partner in WSG Development and its related development activities is Mr. Wolman.  Mr. Kalman, through his entity DFK Holdings, LLC, recently purchased some of Mr. Wolman's equity in various WSG Development business interests.  Mr. Kalman does not control the Debtors, nor does he have any active role in WSG Development's development activities.

Each outparcel is leased to nationally-recognized retailers.  All of the Debtors in these jointly-administered bankruptcy proceedings own such outparcels:

- Dulles GL owns certain real estate located at 45450 Dulles Crossing Plaza, Sterling, Loudoun County, Virginia (the "Dulles Property").  The Dulles Property is adjacent to Dulles Town Crossing, a large commercial retail complex with 799,442 square feet of commercial space and over 4,000 parking spaces.  Dulles GL leases the Dulles Property to Dulles LP pursuant to a ground lease.  On or about 2001, Dulles LP constructed a commercial building, parking lot, and other improvements (collectively, the "Improvements") on the Dulles Property.  The building contains a total of approximately 9,000 square feet of leased retail space.  The current tenants are The Men's Wearhouse and The Vitamin Shoppe, both respected, well-known national retail chains which have leased their respective premises for more than ten years.

- Trace Fork owns certain real property located at 86-90 KHL Boulevard, Charlotte, Kanawha County, West Virginia (the "Trace Fork Property").  The Trace Fork Property consists of a retail building on approximately 0.96 acres that is part of a shopping center known as The Shops at Trace Fork.  The Shops at Trace Fork is located at the corner of Trace Fork Boulevard and RHL Boulevard in South Charleston, West Virginia and contains over 471,000 square feet of retail space.  The current tenants are The Men's Wearhouse and Casual Male, both of which have leased their respective premises for more than ten years.

- Charlottesville owns certain real property and improvements known as the Charlottesville Center and located at 1646 Seminole Trail, Charlottesville, Virginia 22901 (the "Charlottesville Property").  The Charlottesville Property is located on U.S. Route 29, a heavily-travelled main road lined with retail centers and strip malls.  The current tenants are Mattress Warehouse and GameStop, both of which have leased their respective premises for more than ten years.  The building also has a third retail space which is currently vacant due to the closure of Norwood Shoes.

## B.    The Lehman Refinancing

In July 2007, the property interests of fifteen entities (the "WSG Entities") affiliated with WSG Development were all subject to a common refinancing transaction with Lehman Brothers Bank, FSB (the "Lehman Refinancing").  The principals of the WSG Entities had a long-standing relationship with Lehman and reluctantly agreed to the refinancing at Lehman's insistence.  Through the Lehman Refinancing, the properties owned by the WSG Entities were

divided into two "pools."  The properties of the WSG Debtors and four affiliated entities[2] (together, "WSG Pool 1") comprised one pool; the properties of eight affiliated entities comprised the second pool (together, "WSG Pool 2").  Each separate property was subject to its own note and deed of trust.  In addition, the debts of the entities within the same pool were cross-collateralized, so that a default by one entity in the pool could potentially result in a default on the obligations of the other entities in the same pool.

In connection with the Lehman Refinancing, on July 12, 2007, Dulles GL, Trace Fork, and Charlottesville each executed a promissory note (the "Note").  The original principal amount of the Note executed by Dulles GL is $3,280,000; the original principal amount of the Note executed by Trace Fork is $2,160,000; and the original principal amount of the Note executed by Charlottesville is $2,480,000.[3]  The Debtors also each entered into a Leasehold Deed of Trust, Fixture Filing and Security Agreement (the "Deed of Trust")[4], whereby each Debtor pledged its respective property as security for its respective Note, as well as for the obligations and liabilities (the "Cross-Collateralized Debts") of the other entities in WSG Pool 1.  The Debtors also executed certain other loan documents (collectively, with the Note and Deed of Trust, the "Loan Documents").  As explained above, the Deed of Trust secured the Note, as well as the obligations and liabilities (the "Cross-Collateralized Debts") of the other entities in WSG Pool 1.

---

[2] The affiliated entities are WSG Short Pump, LLC, WSG Monroe, LLC, WSG Snellville, LLC, and ATL2130, Limited Partnership.

[3] In paragraph 8 of the Opinion, the Bankruptcy Court states that each Debtor stipulated as to the amount of its respective promissory note, as well as the total amount of the debt guaranteed by such Debtor.  This statement is misleading.  Each Debtor stipulated only as to the original principal amount of its respective promissory note and the initial aggregate principal guaranteed amount, not the current amounts of such obligations.  *See* Movant's Exhibits Nos. 1-3.

[4] With respect to the Dulles Debtors, Dulles GL as Borrower and Dulles LP as Co-Mortgagor entered into that certain Leasehold Deed of Trust, Fixture Filing and Security Agreement.

Dulles GL, Trace Fork, and Charlottesville also executed a Guaranty of Payment (the "Guaranty"), whereby each guaranteed the Cross-Collateralized Debts.[5]

### C.     Events Leading to the Bankruptcy Filings

On or about fall of 2010, disputes arose between the WSG Pool 1entities and Bank of America, N.A., as Trustee for the Registered Holders of LB Commercial Mortgage Trust 2007-C3, Commercial Mortgage Pass-Through Certificates, Series 2007-C3 ("Bank of America"). LNR Partners, LLC, is the special servicer for Bank of America ("LNR").  Based upon LNR's representations that Bank of America no longer wished to hold the WSG Pool 1 loans, the Debtors sought and ultimately secured replacement financing.  Because the WSG Pool 1 entities believed that replacement financing would soon be in place, the WSG Pool 1 entities made the strategic decision to stop making debt service payments on or about February 2011.

Shortly thereafter, LNR, in its capacity as special servicer for Bank of America, sent notices of default to certain WSG Pool 1 entities.  Nonetheless, the Debtors, along with the other WSG Pool 1 entities, made continued efforts to resolve their disputes with Bank of America through LNR.  LNR repeatedly requested that the WSG Pool 1 Entities provide certain information or meet certain benchmarks but would at no time commit to a specific agreement, even after the WSG Pool 1 entities satisfied LNR's requests.  It was only after LNR reviewed the replacement refinancing term sheet that it cut off negotiations and moved forward with foreclosure of the properties held by the WSG Pool 1 entities.

In 2011 and 2012, Bank of America assigned its interest in the Debtors' Loan Documents, as well as the Loan Documents of the other WSG Pool 1 entities, to the following special purpose entities:  LBCMT 2007-C3 Sterling Retail, LLC, LBCMT 2007-C3 Pleasant

---

[5] In addition to the Guaranty executed by the WSG Pool 1 entities, Eric Sheppard and Philip Wolman executed that certain Guaranty of Recourse Obligations (the "Personal Guaranty") for each of the properties in WSG Pool 1.

Retail Limited Partnership, LBCMT 2007-C3 Seminole Trail, LLC, LBCMT 2007-C3 W. Broad

Street, LLC, LBCMT 2007 C-3 Snellville Retail Partnership, LBCMT 2007 C-3 Pecanland,

LLC, and LBCMT 2007 C-3 RHL Blvd. Limited Partnership (each, an "LBCMT Entity" and

collectively, the "LBCMT Entities").  Each of the LBCMT Entities holds the Loan Documents

for one of the WSG Pool 1 entities and, as the primary lender (the "Primary Lender") to that

entity,  has a first priority security interest in that entity's property.  LBCMT 2007-C3 Sterling

Retail, LLC became the Primary Lender for the Dulles Debtors through an assignment on or

about October 2011; LBCMT 2007 C-3 RHL Blvd. Limited Partnership became the Primary

Lender for Trace Fork through an assignment on or about December 2011; and LBCMT 2007-

C3 Seminole Trail, LLC became the Primary Lender for Charlottesville through an assignment

on or about March 2012.

By notice dated January 31, 2012, a full year after the Dulles Debtors stopped making

debt service payments, the Dulles Primary Lender declared the Dulles Note in default and

accelerated the entire principal balance, accrued interest, fees and expenses.  The Dulles Primary

Lender subsequently scheduled a foreclosure sale for February 23, 2012, which was stayed by

the Dulles Debtors' bankruptcy filing.  Similarly, by notice dated January 12, 2012, a full year

after Trace Fork stopped making debt service payments, the Trace Fork Primary Lender declared

the Trace Fork Note in default and accelerated the entire principal balance, accrued interest, fees

and expenses.  The Trace Fork Primary Lender subsequently scheduled a foreclosure sale for

March 16, 2012, which was rescheduled to March 28, 2012 and ultimately stayed by the Trace

Fork's bankruptcy filing.  Finally, by notice dated April 9, 2012, more than fifteen months after

Charlottesville stopped making debt service payments, the Charlottesville Primary Lender

declared the Charlottesville Note in default and accelerated the entire principal balance, accrued

interest, fees and expenses.  The Charlottesville Primary Lender subsequently scheduled a foreclosure sale for May 1, 2012, which was stayed by Charlottesville's bankruptcy filing.

### D.      The Chapter 11 Bankruptcy Cases

As noted above, the Bankruptcy Cases were filed sequentially, with the Dulles Debtors filing their petitions on February 23, 2012; Trace Fork, on March 16, 2012; and Charlottesville, on May 1, 2012.  During the pendency of the Bankruptcy Cases, the Debtors took steps to ensure that their respective business operations continued without interruption.  In each of the Bankruptcy Cases, the Court entered an Agreed Order Pursuant to Bankruptcy Code Sections 105(a), 361 and 363 and Bankruptcy Rules 2002 and 4001 (I) Authorizing Debtor to Use Cash Collateral, (II) Authorizing Debtor to Provide Adequate Protection, and (III) Granting Certain Related Relief  (the "Cash Collateral Order") [Docket No. 37 in the Dulles LP Bankruptcy Case; Docket No. 27 in the Trace Fork Bankruptcy Case; and Docket No. 43 in the Charlottesville Bankruptcy Case].  Each Cash Collateral Order authorizes the applicable Debtor to make certain expenditures pursuant to the Budget attached as an exhibit to the Cash Collateral Order.  Such expenditures include payments to trade vendors and service providers, as well as adequate protection payments, ensuring that the Debtors' retail tenants enjoyed the same level of service as they had prior to the Bankruptcy Cases.  The Cash Collateral Orders were entered by the Court with the consent of each Debtor's respective Primary Lender.

The Debtors also endeavored to improve their businesses during these Bankruptcy Cases. Charlottesville, in particular, had been actively seeking a new tenant to fill the storefront left vacant when Norwood Shoes went out of business.  Charlottesville engaged in discussions with several interested retailers and was close to signing a letter of intent; however, negotiations have been stalled due to the uncertainty surrounding these Bankruptcy Cases.

Finally, during these Bankruptcy Cases, the Debtors worked to resolve disputes with their creditors.  Most significantly, the Debtors resolved claims alleged by Joel Tabas, as chapter 7 trustee for the estate of Capitol Investments USA, Inc., against Dulles LP, Trace Fork, Charlottesville and certain other entities and individuals (together, the "Tabas Claimants") in an adversary proceeding pending before the United States Bankruptcy Court for the Southern District of Florida (Miami Division), captioned as *Tabas v. Sheppard, et al. (In re Capitol Investments USA, Inc.)*, Adv. Proc. No. 11-02587 (LMI) (the "Tabas Litigation").  In connection with the Tabas Litigation, Mr. Tabas filed a proof of claim against Dulles LP in the amount of $205,000 (Claim No. 3 filed in Case No. 12-11149-BFK), against Trace Fork in the amount of $175,000 (Claim No. 1 filed in Case No. 12-11756-BFK), and against Charlottesville in the amount of $930,800 (Claim No. 1 filed in Case No. 12-12785-BFK).  The Tabas Litigation was settled, and the claims filed by Mr. Tabas in each of the Bankruptcy Cases were resolved.  *See* order entered on September 25, 2012 [Docket No. 2562 in *the Capitol Investments USA* bankruptcy case, Case No. 09-36408-LMI].  *See* Movant's Exhibit 21.

### E.    The Motions to Dismiss

On June 26, 2012, the LBCMT Entities filed their Motion to Dismiss Bankruptcy Case of WSG Charlottesville, LLC, or, in the Alternative, for Relief from the Automatic Stay with Respect to Such Debtor (the "Motion to Dismiss") [Docket No. 56, as amended by Docket No. 63].  The LBCMT Entities filed similar motions to dismiss or, in the alternative, for relief from the automatic stay, with respect to the Bankruptcy Cases of the Dulles Debtors and the Trace Fork Bankruptcy Case [Docket Nos. 55 and 57, respectively].  As memorialized in the Agreed Order Extending Bridge Order and Continuing Reply Deadlines and Hearings on Debtors' Motion to Extend Exclusivity and on the LBCMT Lenders' Motions to Dismiss the Bankruptcy

Cases of Debtors [Docket No. 66], the hearing on the Motions to Dismiss was continued pending

resolution of a motion to transfer venue filed in the chapter 11 bankruptcy case of ATL2130

Limited Partnership ("ATL2130")[6], one of the WSG Pool 1 entities (Case No. 11-76017-PWB,

United States Bankruptcy Court for the Northern District of Georgia).  Once the motion to

transfer venue was resolved, the hearing on the Motions to Dismiss was scheduled for November

2, 2013.  The Debtors filed Objections to the Motions to Dismiss (the "Objections") on October

26, 2012 [Docket Nos. 94, 95, and 96].

      The hearing on the Motions to Dismiss was held on November 2 and continued to

November 5, 2012.  At the conclusion of the hearing, the Bankruptcy Court took the matter

under advisement and entered an order extending the automatic stay for sixty days [Docket No.

106].  Thereafter, the Debtors became aware of new information relevant to the Motions to

Dismiss, which information was presented to the Court in the Debtors' Supplemental

Memorandum to the Debtors' Objections to the Motions to Dismiss filed on November 19, 2012

(the "Supplemental Memorandum") [Docket No. 111].  The LBCMT Entities filed a response to

the Supplemental Memorandum on November 29, 2012 [Docket No. 113].  On January 2, 2013,

the Bankruptcy Court entered an order extending the automatic stay for an additional thirty days

[Docket No. 117].  The Opinion and Order which are the subject of this appeal were entered on

the docket on January 4, 2013.

      **F.**    **The Debtors' Chapter 11 Plan**

      On October 26, 2012, the Debtors filed their Joint Chapter 11 Plan of Reorganization (the

"Plan").   The Plan provided for the reinstatement of the secured debt of the Debtors, the

resolution of the allowance of claims and equity interests, and the distribution to creditors in

accordance with the priorities of the Bankruptcy Code.  The key elements of the Plan were:

---

[6]  In paragraphs 5 and 7 of the Opinion, the Bankruptcy Court incorrectly refers to ATL2130 as "WSG ATL2130."

- The cure and reinstatement of secured debt of the Primary Lender of the Dulles Debtors, Trace Fork, and Charlottesville  through an equity infusion made by or on behalf of the holders of equity interests for a Debtor, in an amount sufficient to pay the cure amount to reinstate the debt held by the  Primary Lender, as well all allowed priority claims, all allowed professional fee claims, and all other required cure amounts for such Debtor on the effective date of the Plan;

- The payment in full over five years of the allowed claims of the LBCMT Entities (other than the Primary Lenders of the Dulles Debtors, Trace Fork, and Charlottesville, the claims of which would be subject to cure and reinstatement as set forth above) through subsequent equity infusions, as needed, made by or on behalf of the holders of equity interests for a Debtor, in an amount sufficient to make quarterly payments on account of these claims;

- The payment in full of allowed priority claims on the effective date of the Plan; and

- The payment in full of all allowed general unsecured claims over time from cash generated by each Debtor's respective business operations.  Alternatively, holders of allowed general unsecured claims would be paid from the proceeds of a refinance of the debt or a sale of the applicable Debtor's real property.

In proposing the Plan, the Debtors realized that certain provisions of the Plan would be subject to amendment depending upon the outcome of certain planned and pending matters, including, for example, a potential venue transfer of the ATL2130 bankruptcy case to the Bankruptcy Court and objections to the claims of the LBCMT Entities which the Debtors intended to file.  Despite the fact that revision would be necessary, the Plan was proposed in

good faith.  The Debtors felt confident that they could establish feasibility and that they could formulate a Plan that would ultimately be confirmable.

## V.   STANDARD OF REVIEW

The standard for a district court's review of orders entered by a bankruptcy court is well-established in this jurisdiction.  The bankruptcy court's findings of fact are reviewed for clear error, and its conclusions of law are reviewed *de novo*.  *See In re Southeast Hotel Properties, L.P.*, 99 F.3d 151, 154 (4th Cir. 1996); *In re McKoy*, 211 B.R. 843, 846, n.3 (E.D. Va. 1997).  Mixed questions of law and fact are also reviewed *de novo*.  *In re Litton*, 330 F.3d 636, 642 (4th Cir. 2003); *In re Johnson*, 312 B.R. 810, 817 (E.D. Va. 2004).

## VI.   ARGUMENT

### A.   Dismissal of the Bankruptcy Cases Was Not Warranted under the *Carolin* Test.

Section 1112 of the Bankruptcy Code addresses conversion or dismissal of a chapter 11 bankruptcy case.  Section 1112(b)(1) of the Bankruptcy Code states that a court may dismiss a chapter 11 bankruptcy case "for cause,"  and section 1112(b)(4) sets forth a non-exhaustive list of factors to be considered by the courts in determining whether or not cause exists for dismissal, including "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation" (section 1112(b)(4)(A)), "gross mismanagement of the estate" (section 1112(b)(4)(B)), and "failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court" (section 1112(b)(4)(J)).

In the Fourth Circuit, the guidelines set forth in Section 1112 of the Bankruptcy Code must be considered in conjunction with the Fourth Circuit's decision in *Carolin Corp. v. Miller*, 886 F.2d 693, 694 (4th Cir. 1989).  In *Carolin*, 886 F.2d at 694, the Fourth Circuit held that a chapter 11 bankruptcy petition may be dismissed "for want of good faith in filing."  The Fourth

Circuit warned, however, that such a dismissal may only be made "with great caution and upon supportable findings both of objective futility of any possible reorganization and the subjective bad faith of the petitioner in invoking this form of bankruptcy protection." *Id.*   The Fourth Circuit explicitly recognized the stringent nature of its two-pronged test:

> [Requiring both objective futility and subjective bad faith is] the only sufficiently stringent test of justification for threshold denials of Chapter 11 relief. Such a test obviously contemplates that it is better to risk proceeding with a wrongly motivated invocation of Chapter 11 protections whose futility is not immediately manifest than to risk cutting off even a remote chance that a reorganization effort so motivated might nevertheless yield a successful rehabilitation. Just as obviously, it contemplates that it is better to risk the wastefulness of a probably futile but good faith effort to reorganize than it is to risk error in prejudging its futility at the threshold.

*Id.* at 701.  The movant bears the initial burden of establishing cause for dismissal.  *In re Landmark Atlantic Hess Farm, LLC*, 448 B.R. 707, 711 (Bankr. D. Md. 2011).  Here, the Bankruptcy Court erred in holding that the LBCMT Entities established cause for dimissal under both prongs of the *Carolin* test.

### 1.   Failure to Pay Sums Due to Primary Lender Pre-Petition is Not *Per Se* Evidence of Bad Faith.

The Bankruptcy Court held that the Debtors filed their cases in bad faith because the Debtors (i) withheld pre-petition loan payments from their respective Primary Lender; (ii) rather than holding such sums in escrow at the entity level, the Debtors transferred the money to WSG Development; and (iii) the specific amount of such transfers was disclosed when the Debtors filed their amended schedules, but not sooner.  The Bankruptcy Court concluded, "[t]he Court understands Mr. Sheppard's desire not to pay the Lender's Exit Fees . . . In an effort to gain leverage in the workout negotiations, he decided to withhold the rents from the secured lender. This, in and of itself, is not all that unusual or objectionable.  But when Mr. Sheppard decided to

pay the withheld rents – totaling $738,484.90 – to WSG Management, the Debtors irreversibly crossed into the territory of bad faith."[7]  Opinion at p. 13.

While the above-listed actions arguably portray the debtors as less than "ideal" chapter 11 debtors, they simply do not conclusively prove that the Debtors filed the Bankruptcy Cases in subjective bad faith.  With respect to the subjective bad faith inquiry, the Fourth Circuit has cautioned strongly against the "dangers of overemphasis on particular indicia or patterns, of engaging in mere indicia-counting, and of forcing particular facts into previously identified patterns."  886 F.2d at 701.  Instead, the *Carolin* court favored a "totality of circumstances inquiry."  *Id.*  In making the subjective bad faith inquiry, a court should merely ensure that the debtor seeks to use the provisions of the Bankruptcy Code "to reorganize or rehabilitate an existing enterprise, or to preserve going concern values of a viable or existing business."  *Id.* at 702 (internal citations omitted).

Other than stating that the Debtors "irreversibly crossed into the territory of bad faith," Opinion at p.3, the Bankruptcy Court offers no explanation for its finding that the withholding and eventual upstreaming of rent receipts that otherwise should have been applied to debt service payments amounts to subjective bad faith.  By the same token, the Bankruptcy Court did not, in any way, tie these prepetition acts to the conclusion that the Debtors were acting in bad faith when they filed their bankruptcy petitions.  The Bankruptcy Court also did not provide any rationale for how the Debtors' actions were somehow different than the actions of many similarly situated debtors – commercial and consumer – who fall behind on their mortgages, use their debt service payments for other purposes, and then properly seek the benefits of bankruptcy protection.  The Bankruptcy Court never addressed the question of whether the Debtors were

---

[7]   The Bankruptcy Court incorrectly identified the entity to which the Debtors transferred funds as WSG Management.  The funds were in fact transferred to WSG Development.

using the protections of bankruptcy for improper purposes, as encouraged by the *Carolin* decision.

Instead, the Bankruptcy Court seems to have focused on two misconstrued facts with respect to the withheld debt service payments.  First, the Bankruptcy Court stated that the amount of the diverted payments was $738,484.90 (Opinion at p. 12) and appeared to emphasize the apparent significance of this sum (Opinion at pp. 12-13).  This amount was not, however, just the amount of the diverted payments, as the Bankruptcy Court asserts.  Rather, this was the total amount of transfers to WSG Development identified by each of the Debtors in response to Question 3c of the Amended Statement of Financial Affairs ("SOFA").  Dulles LP identified transfers in the amount of $359,480.83 to WSG Development within the one year preceding the bankruptcy filing; Charlottesville, transfers in the amount of $133,493.44; and Trace Fork, transfers in the amount of $245,510.63. *See* Movant's Exhibits 7, 10, and 13.  These transfers made to WSG Development did not just represent "diverted payments."  Rather, these transfers included payment of management fees, payment of other ordinary pass-through fees, and payment of ordinary course of business upstream transfers, as well as payment of monies that otherwise would have been used to pay debt service. Moreover, the monthly debt service on these three commercial properties is not insignificant.  The monthly debt service payments for each of the Debtors is approximately $29,076 for Dulles LP, $15,744 for Trace Fork, and $18,037 for Charlottesville, for a total monthly debt service obligation for all of the Debtors of $62,857.  Given this amount, it would not take long for three commercial debtors to "divert" what appeared to be large sums of money.

Second, the Bankruptcy Court asserted that "the Debtors concealed the diversion of the funds in their initial filings with the Court." Opinion at p. 12.  While it is true that the Debtors

did not reveal the <u>specific</u> amount of the transfers in the original SOFAs filed with the Bankruptcy Court, the Debtors clearly indicated in response to Question 3c of the SOFA that WSG Development received transfers from the Debtors.  The Debtors did not attempt to conceal the transfer of these funds but instead waited until they had gathered all the necessary information to file complete and accurate amended schedules and SOFAs, which took some time due to the complex nature of the underlying financing transaction.

The Bankruptcy Court clearly misconstrued important facts with respect to the amount of the transferred funds and the concealment of such funds.  Accordingly, the Bankruptcy Court's focus on these issues was misplaced.  The Bankruptcy Court also did not address whether the Debtors were using the protections of bankruptcy for anything other than a legitimate purpose. The facts presented simply do not support a finding, under the test set forth in *Carolin*, that these Bankruptcy Cases were filed in subjective bad faith.

> 2. **The Fact that the Plan Requires Modification Does Not Necessarily Render the Bankruptcy Cases Objectively Futile.**

The Bankruptcy Court held that the Bankruptcy Cases were objectively futile, as required by the second prong of the *Carolin* test, because the Plan, as filed, was not confirmable.  The Bankruptcy Court's analysis focused on the following issues: (i) the Debtors had not given adequate information about and evidence of the proposed equity infusion; (ii) the definition of "Non-Primary Lender Claims" did not include the claims (other than the secured debt of the Primary Lender) held by the LBCMT Entities against ATL2130 and the Debtors; (iii) the Plan did not acknowledge the right of the LBCMT Entities to credit bid; and (iv)  the Debtors' would not be able to gain acceptance of the Plan from an impaired non-insider class of claims.  The Bankruptcy Court stated that its concerns with the equity infusion were not "fatal to the Debtors' attempt to reorganize, and by itself, would not result in dismissal of these cases."  Opinion at p.

15.  Despite the representation of Debtors' counsel at the hearing that these issues would be addressed in an amended plan once the transfer of venue of the ATL2130 bankruptcy case was resolved, the Bankruptcy Court stated its belief that the remaining issues identified above were not capable of amendment and were thus fatal to the Debtors' plans.  For these reasons, the Bankruptcy Court held that the Bankruptcy Cases were objectively futile.

In *Carolin*, the Fourth Circuit explained the second prong of its test for dismissal as follows: "The objective futility inquiry is designed to insure that there is embodied in the petition some relation to the statutory objective of resuscitating a financially troubled [debtor].  It should therefore concentrate on assessing whether there is no going concern to preserve . . . and . . . no hope of rehabilitation . . . ."  886 F.2d at 702 (internal citations omitted).  The reasoning provided by the Bankruptcy Court for its finding of objective futility does not, however, even mention whether, in these Bankruptcy Cases, there was a going concern to preserve or whether there was any hope of rehabilitation.  As at least one other bankruptcy court within the Fourth Circuit has noted, issues of confirmation are best determined at the confirmation hearing and should not be dispositive on the issue of objective futility.  *See In re Easthaven Marina Group, LLC,* Case No. 08-05453-8-JRL, unpublished opinion dated February 25, 2009, at p. 10 ("As to the debtor's ultimate futility, the court's inquiry into this matter is best reserved for the hearing on confirmation.").

In the Opinion, the Bankruptcy Court focused almost exclusively on issues of confirmability.  While the issues raised by the Bankruptcy Court are not without merit, the confirmability of the Plan hinges on the determination of the allowance of the claims of the LBCMT Entities.  The Cross-Collateralized Debts resulting from the cross-guaranties at the

foundation of the Lehman Refinancing no doubt posed complex and novel legal issues.[8]  These issues are most appropriately addressed through the claims objection process, with an opportunity for both parties to undertake comprehensive discovery, engage financial experts experienced with similar complex financing transactions, and brief fully the underlying legal issues.

Without the benefit of a full hearing on the allowance of the claims of the LBCMT Entities, the Bankruptcy Court's conclusion that the Bankruptcy Cases were objectively futile was premature.  If, through the claims objection process, the Bankruptcy Court decided anything other than that the claims based on cross-defaults attributable to non-debtor debt obligations were valid and should be allowed in full, two of most troubling the issues identified by the Bankruptcy Court in the Opinion as evidence of objective futility (definition of Non-Primary Lender Claims and the inability of the Plan to have an accepting creditor class) would have become moot.  For these reasons, under the standard set forth in *Carolin*, the Bankruptcy Court erred in determining that the Bankruptcy Cases were objectively futile.

**B.**     **Relief from the Automatic Stay Was Not Appropriate Where the Debtors Have Equity.**

The Bankruptcy Court held that, notwithstanding the fact that the LBCMT Entities' request for relief from the automatic stay was rendered moot by its decision on the Motion to Dismiss, the granting of relief from the automatic stay was appropriate.  "Given the values [of the Debtors' Properties] there is simply no way for the Debtors to overcome the fact that the

---

[8]  With the exception of *JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns, Inc.)*, 419 B.R. 221 (Bankr. S.D.N.Y. 2009), discussed in the Debtors' Objections, counsel has found very little bankruptcy case law specifically addressing the treatment of such cross-guaranties and the debt obligations potentially resulting therefrom.

cross-collateralization of the seven Borrower obligations leads inexorably to the conclusion that there is no equity in the three Debtors properties." Opinion at pp. 22-23.

Section 362(d)(2) of the Bankruptcy Code requires that the movant demonstrate that the debtor has no equity in its property and that the property is not necessary for an effective reorganization. The Bankruptcy Court held that relief from the automatic stay was appropriate because the equity in the three Debtor properties (the Dulles Property, Trace Fork Property, and Charlottesville Property) could not support the total debt obligation resulting from the Cross-Collateralized Debts. However, the Bankruptcy Court's reasoning was flawed because equity must be measured on a property by property basis. In any financing transaction where debts are cross-collateralized, the value of a fraction of the total collateral (in this case, one-seventh) will rarely if ever exceed the total amount of the cross-collateralized debt. This situation is hardly surprising and certainly no basis for granting relief from the automatic stay. It is simply a truism of complex debt structures: Where a single asset serves as collateral for multiple debts, the value of the single asset will rarely if ever exceed the total amount of the debt and cannot be viewed in a vacuum. Rather, it must be valued together with all other assets that serve as collateral for these multiple debts.

The Bankruptcy Court also reasoned that relief from the automatic stay was appropriate because the Debtors failed to show that an effective reorganization was in prospect. As noted above, whether the Debtors had a reasonable likelihood of proposing a successful reorganization depended in large part on the determination of the allowance of the claims of the LBCMT Entities, which was most appropriately addressed through the claims objection process. Until the issue of the allowance of the claims of LBCMT Entities was resolved, any prediction on the Debtors' ability to propose an effective plan of reorganization was pure conjecture.

In this case, relief from the automatic stay was not appropriate at this stage of the Bankruptcy Cases.  The Debtors have equity in their respective properties, as measured on a property-by-property basis.  More importantly, the Debtors stand ready to propose an effective plan of reorganization once the allowance of the claims of the LBCMT Entities is resolved.

## VII.   CONCLUSION

For the above reasons and those stated in the Debtors' Objections to the Motion to Dismiss, the Debtor respectfully requests that this Court reverse the Opinion and Order of the Bankruptcy Court, reinstate the Bankruptcy Cases, and remand the case to the Bankruptcy Court with instructions to issue any necessary orders consistent with such a reversal.

Dated: March 11, 2013                                 Respectfully submitted,


                                                      _/s/ Stephen E. Leach_____
                                                      Lawrence A. Katz (VSB No. 47664)
                                                      Stephen E. Leach (VSB No. 20601)
                                                      Kristen E. Burgers (VSB No. 67997)
                                                      Leach Travell Britt pc
                                                      8270 Greensboro Drive, Suite 700
                                                      Tysons Corner, Virginia 22102
                                                      Email: lkatz@ltblaw.com
                                                      Telephone: (703) 584-8362
                                                      Facsimile:  (703) 584-8901

                                                      *Counsel to the Appellant*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 11th day of March, 2013, a copy of the foregoing Brief of Appellant was served via United States mail, first class postage prepaid upon the parties named below.

Jack I. Frankel
Office of the United States Trustee
115 S. Union Street, Room 210
Alexandria, VA  22314

John H. Maddock III
Aaron G. McCullough
McGuireWoods, LLP
One James Center
901 E Cary St
Richmond, VA 23219


*/s/ Kristen E. Burgers*
Kristen E. Burgers